UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ORLANDOUS TYRONE JACKETT,<br><br>                              Petitioner,<br><br>v.<br><br>KELLY SANTORO, Warden,<br><br>                              Respondent. | Case No.:  21cv1626-L (MSB)<br><br>**REPORT AND RECOMMENDATION FOR ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

This Report and Recommendation is submitted to United States District Judge M. James Lorenz pursuant to 28 U.S.C. § 636(b) and Civil Local Rules 72.1(d) and HC.2 of the United States District Court for the Southern District of California.  On September 16, 2021, Petitioner, Orlandous Tyrone Jackett, a state prisoner represented by counsel, commenced these habeas corpus proceedings pursuant to 28 U.S.C. § 2254.  (ECF No. 1.)  Petitioner challenges the constitutionality of his state court conviction for first-degree murder.  (See id. at 2.)  Respondent answered on December 15, 2021.  (ECF No. 6.)  Petitioner filed a traverse on January 3, 2022.  (ECF No. 8.)

This Court has considered the Petition, Answer, Traverse, and all supporting documents filed by the parties.  For the reasons set forth below, this Court **RECOMMENDS** that Petitioner's Petition for Writ of Habeas Corpus be **DENIED**.

# I.      FACTUAL BACKGROUND

The following facts are taken from the California Court of Appeal's opinion in People v. Jackett, Appeal No. D071898.  (See ECF No. 7-30.)  This Court presumes the state court's factual determinations to be correct, absent clear and convincing evidence to the contrary.  See 28 U.S.C. § 2254(e)(1); Miller-El v. Cockrell, 537 U.S. 322, 340 (2003); see also Parke v. Raley, 506 U.S. 20, 35 (1992) (findings of historical fact, including inferences properly drawn from such facts, are entitled to statutory presumption of correctness).

*Drive-By Murder* (*Counts 1 and 2*)

Jackett was a member of the Neighborhood Crips criminal street gang. In January 2013 Jackett's car was set on fire.  A rival gang took credit for burning Jackett's car. Jackett's gang criticized him for not retaliating. Jackett told his former girlfriend, Margie D., that he was going to " 'F' " whoever was responsible for burning his car.

About two months later, Jackett got into his red Range Rover and went to the rival gang's territory to "hunt" for a rival gang member. Jackett saw the victim, a pedestrian, wearing clothes in the rival gang colors and a baseball cap embroidered with what appeared to be a gang moniker. Jackett fired multiple gunshots at the victim from his car, killing him. The victim suffered multiple gunshot wounds; one wound was consistent with being shot from behind.

About one minute after the shooting, Jackett called Margie and asked her to pick him up at his aunt's house, close to where the murder occurred. Sometime after the murder, Jackett disassembled the gun he used to kill the victim, told Margie that he needed to get rid of it, and dumped the gun into a marina.

Margie told police that Jackett admitted to her that he had killed the victim. Margie, however, was unwilling to repeat that claim during trial, stating she could not remember. Margie also suggested to police that Jackett had someone burn the Range Rover after the murder and that she was not involved in the arson of the Range Rover.  At trial, under a grant of

immunity pursuant to section 1324,[1] Margie testified that she asked for the Range Rover to be burned and that she did so for the insurance money.

*Child Endangerment and Felon in Possession of Firearm* (*Counts 3-6*)

In February 2014 officers searched Jackett's home which he shared with Margie; their child; Margie's father, William; and Margie's three other children, who ranged in age from four to eight. When the officers entered the home, three children were lying on the couch in the living room in their pajamas, as though they were about to go to sleep. The police moved William and the children to the kitchen while they conducted a search. Under one of the couch cushions police found a plastic bag with a loaded handgun inside. The gun had 18 cartridges in the magazine and one round in the chamber. The gun did not have a safety and it would "not take a lot of pressure on th[e] trigger to discharge the live-round ammunition that's inside the chamber."

The officers concluded that the home was a dangerous environment for the children. When one of the officers told the children they would have to leave the house, one of the children told the officer that the gun belonged to Jackett and pointed to a photo of Jackett and Margie. Subsequent DNA testing revealed that Jackett was a possible major contributor to the mixture of DNA found on the gun, while William was excluded as a contributor. Margie denied any knowledge of the gun and insinuated that Jackett placed it there.

---

[1] Section 1324 provides, in relevant part: "In any felony proceeding . . . if a person refuses to answer a question . . . on the ground that he or she may be incriminated thereby, and if the district attorney . . . in writing requests the court . . . to order that person to answer the question . . . a judge shall . . . order the question answered . . . unless it finds that to do so would be clearly contrary to the public interest, or could subject the witness to a criminal prosecution in another jurisdiction, and that person shall comply with the order. After complying, and if, but for this section, he or she would have been privileged to withhold the answer given or the evidence produced by him or her, no testimony or other information compelled under the order or any information directly or indirectly derived from the testimony or other information may be used against the witness in any criminal case. But he or she may nevertheless be prosecuted or subjected to penalty or forfeiture for any perjury, false swearing or contempt committed in answering, or failing to answer, or in producing, or failing to produce, evidence in accordance with the order. Nothing in this section shall prohibit the district attorney or any other prosecuting agency from requesting an order granting use immunity or transactional immunity to a witness compelled to give testimony or produce evidence."

*Felon in Possession of Firearm* (*Count 7*)

One evening in August 2014 a gang officer attempted to contact Jackett on the street. As the officer opened his car door, Jackett took off running and the officer gave chase. Jackett jumped a fence into someone's yard and continued to run. The officer eventually caught Jackett hiding underneath a parked car. Officers searched the yards that Jackett had run through, but did not find anything.

The following morning, the resident of a house adjacent to where Jackett had been running the night before reported finding a gun inside a sock in his yard. The resident had been working in the yard the day before, and the gun had not been there. DNA testing on the gun and sock revealed a mixture of DNA from at least four individuals, but it was determined that Jackett was not a major contributor to the DNA mixture.

(ECF No. 7-30 at 3-6.)

## II.    PROCEDURAL BACKGROUND

Petitioner went to trial on seven charges:  Count 1 charged him with murder in violation of California Penal Code section[2] 187(a), with special allegations that he intentionally and personally discharged a firearm, proximately causing death in violation of section 12022.53(d), committed the offense for the benefit of a criminal street gang in violation of section 186.22(b)(1), and committed the offense while on bail in violation of section 12022.1(b).  (ECF No. 7-1 at 58-63.)  Two counts charged Petitioner with possession of a firearm by a felon in violation of section 29800(a)(1) (in connection with the murder, Count 2, and the incident where the gun was found in the couch with the children, Count 3).  Counts 4, 5, and 6 charged three felony child abuse in violation of section 273a(a) (one count for each of the three children present on the couch).  (Id.) Finally, Count 7 charged Petitioner with possession of a firearm by a felon related to his August 10, 2014 attempted flight from police.  (Id.)

---

[2] All future references to code sections refer to the California Penal Code unless otherwise specified.

A jury convicted Petitioner of all charges.  The jury found true the personal use of a firearm and gang allegations related to the murder. (ECF No.7-5 at 152-53.)  Petitioner admitted the allegations that he committed crimes while released on bail and to priors consisting of a serious felony and strike convictions, and three prior prison commitments.  (Id. at 161.)  The trial court sentenced Petitioner to an indeterminate term of nine years plus seventy-five years to life and a determinate term of sixteen years and four months in state prison.  (Id. at 101-03.)

On February 13, 2018, Petitioner filed an appeal in the California Court of Appeal, arguing the trial court prejudicially erred by refusing to sever the firearm and child endangerment counts and failing to give a proper jury instruction regarding a prosecution witness' testimony under a grant of immunity.[3]  (ECF No. 7-25 at 23, 48.)  Petitioner also argued he was deprived of effective assistance of counsel when his attorney: (1) failed to object to the prosecutor's improper closing argument, (id. at 63), and (2) allowed Petitioner to admit the third prison prior, even though Petitioner's probation was not revoked on that case until a year and a half after the charged crime, (id. at 89.)  Further, Petitioner argued there was insufficient evidence to support his convictions for child abuse and possession of a firearm in Count 3, and that the 2018 amendment to section 12022.53(h) required remand for resentencing during which the trial court could exercise discretion regarding whether to strike the punishment for the firearm enhancement.  (Id. at 71, 87, 95-98.)  Lastly, Petitioner argued that the cumulative effect of these errors lowered the prosecution's burden of proof and deprived Petitioner of the guarantees of the Fourteenth Amendment.  (Id. at 99.)

In a subsequent filing, Petitioner argued another intervening change in the law required remand for the Court to exercise newly granted discretion regarding whether to strike the five-year serious felony enhancement.  (ECF No. 7-28 at 17-22.)

---

[3] The trial court modified the instructions of CALCRIM No. 226 by removing language that would allow the jury to consider that Margie Daniels' testimony was given under a grant of immunity.

1    The California Court of Appeal affirmed Petitioner's conviction on all counts but

2  vacated his sentence because: (1) trial counsel was prejudicially ineffective by allowing

3  him to plead guilty to the unprovable third prison prior, and (2) intervening legislation

4  made imposition of the firearm and serious felony conviction enhancements

5  discretionary, rather than mandatory.  (ECF No. 7-30 at 31.)  The Court of Appeal

6  remanded to the trial court for resentencing with direction to strike Petitioner's third

7  prison prior and to exercise discretion in deciding whether to strike the firearm and

8  prior serious felony conviction enhancements.  (Id. at 29-31, 37-38, 39.)

9    Petitioner subsequently filed a petition for review in the California Supreme Court

10  raising the same claims raised on appeal, less the claims the appellate court had already

11  granted relief on.  (ECF No. 7-31.)  On April 24, 2019, the California Supreme Court

12  denied review without comment or citation to authority.  (ECF No. 7-32.)  Petitioner was

13  resentenced on October 11, 2019, and did not appeal the resentencing.  (See ECF No. 1-

14  2 at 11; 7-37 at 104.)

15    Petitioner filed his first habeas petition in the California Superior Court on August

16  26, 2020.  (ECF No. 7-33.)  Petitioner sought relief on two grounds: (1) his trial counsel

17  was ineffective due to a conflict of interest and Petitioner's waiver of said conflict was

18  invalid (his first claim in the habeas petition before the court), and (2) his appellate

19  counsel was ineffective for failing to bring the first ineffective assistance of counsel

20  ("IAC") claim on appeal.  (Id. at 11-25.)  On September 8, 2020, the California Superior

21  Court denied the petition on the merits.  (ECF No. 7-34 at 17.)

22    Petitioner filed a habeas petition in the California Court of Appeal on November 5,

23  2020, raising the same claims.[4]  (ECF No. 7-35.)  The court initially denied the petition on

24  procedural grounds, finding the "petition, filed more than three years eight months

25  

26  

27  [4] In California, "[a] petitioner cannot appeal from the denial of his petition for a writ of habeas corpus
by the Superior Court or by the Court of Appeal. . . . His only remedy lies in successive petitions in the
higher state courts."  Harris v. Superior Court, 500 F.2d 1124, 1128 n.5 (9th Cir. 1974) (citing In re Crow,
28  483 P.2d 1206, 1212 n.8 (1971)).

6

after sentencing and nearly one year 10 months after the appeal was decided, with no explanation for the delay, is barred as untimely." (Id. at 3-4.)  Alternatively, the Court of Appeal denied the petition on the merits.  (See id. at 4-6.)

Petitioner subsequently filed another habeas petition in the California Supreme Court on December 10, 2020, raising the same claims that were raised in the two previous petitions.  (ECF No. 7-37.)  Respondent filed an informal response pursuant to a request from the California Supreme Court on March 26, 2021, arguing that Petitioner's trial counsel IAC claim was procedurally defaulted, and both claims were untimely and failed to state a prima facie case for relief.  (ECF No. 7-38.)  The California Supreme Court denied the petition on July 14, 2021, without comment or citation.  (ECF No. 7-40.)

### III.    PETITIONER'S CLAIMS AND RESPONDENT'S ANSWER

Petitioner filed the present Petition for Writ of Habeas Corpus [ECF No. 1] on September 16, 2021, seeking relief on three grounds related to his trial attorney's ineffective assistance:

1.    Petitioner argues that his trial counsel was conflicted based on his prior representation of the prosecution's key witness, and as a result he rendered ineffective assistance to Petitioner.  (Id. at 17.)

2.    Petitioner claims his trial counsel was ineffective for failing to introduce evidence of the star witness' immunity before the jury and not objecting to the Court's modification of a jury instruction that addressed that immunity.  (Id. at 51.)

3.    Petitioner's third claim contends that his trial counsel was ineffective for failing to object to the prosecutor's improper characterization of the star witness' testimony.  (Id. at 63.)

Respondent contends that the Petition should be dismissed as untimely under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") because Petitioner did not file until almost a year after the statute of limitations expired.  (ECF No. 6 at 12-13.) Respondent further contends that Petitioner's conflict-of-interest-based claim should be

denied because it is procedurally defaulted, and Petitioner has not met his burden of establishing an excuse for the default.  (Id. at 13-14.)  Alternatively, Respondent maintains that the state court properly rejected all of Petitioner's ineffective assistance of counsel claims as meritless.  (Id. at 15-16.)

## II.  STANDARD OF REVIEW

This Court has jurisdiction to consider the instant Petition under title 28 of the United States Code section 2254(a), which states:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a).

The instant Petition was filed after April 24, 1996, and therefore it is subject to AEDPA.  (ECF No. 1); Pub. L. No. 104-132, 110 Stat. 1214.  Under 28 U.S.C. § 2254(d), as amended by AEDPA:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412 (2000).  A state court's decision is "contrary to" clearly established federal law if the state court: (1) "applies a rule that contradicts the

governing law set forth in [Supreme Court] cases"; or (2) "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent."  Id. at 405–06.  A state court's decision is an "unreasonable application" of clearly established federal law where the state court "identifies the correct governing legal rule [from Supreme Court decisions] . . . but unreasonably applies [that rule] to the facts of the particular state prisoner's case."  White v. Woodall, 572 U.S. 415, 425 (2014) (quoting Williams, 529 U.S. at 407–08).  In deciding a state prisoner's habeas petition, a reviewing federal court need not decide whether the state court applied clearly established federal law erroneously or incorrectly; rather a federal court applies an extraordinarily deferential review, inquiring only whether the state court's decision was "objectively unreasonable."  See Yarborough v. Gentry, 540 U.S. 1, 4 (2003); Lockyer v. Andrade, 538 U.S. 63, 75–76 (2003); Medina v. Hornung, 386 F.3d 872, 877 (9th Cir. 2004).

When a state supreme court does not provide any explanation for its decision, the reviewing federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning."  Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018); see also Ylst v. Nunnemaker, 501 U.S. 797, 803–04 (1991) (providing that a reviewing federal court may look through to the last reasoned state court decision).  However, "[w]here there are convincing grounds to believe the silent court had a different basis for its decision than the analysis followed by the previous court, the federal habeas court is free, as we have said, to find to the contrary."  Wilson, 138 S. Ct. at 1197.

Habeas relief is also available where the state court's adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding."  28 U.S.C. § 2254(d)(2); see also Wood v. Allen, 558 U.S. 290, 293 (2010).  Federal habeas courts give deference to a state court's application of state law and interpretation of the facts.  See Estelle v.

Maguire, 502 U.S. 62, 67–68 (1991); Lewis v. Jeffers, 497 U.S. 764, 780–81 (1990).  A

reviewing federal court will not overturn a state court's decision on factual grounds

unless the federal court finds that the state court's factual determinations were

objectively unreasonable considering the evidence presented in state court.  See Miller-

El, 537 U.S. at 340; see also Rice v. Collins, 546 U.S. 333, 341–42 (2006) (the fact that

"[r]easonable minds reviewing the record might disagree" does not render a decision

objectively unreasonable).  This Court will presume that the state court's factual findings

are correct, and Petitioner may overcome that presumption only by clear and

convincing evidence.  See 28 U.S.C. § 2254(e)(1); Schriro v. Landrigan, 550 U.S. 465, 473–

74 (2007).

**III.  DISCUSSION**

**A.  According to Ninth Circuit Precedent, the California Supreme Court Decided**
**Petitioner's Habeas Petition on the Merits, so Respondent's Timeliness and**
**Procedural Default Arguments Fail.**

Before addressing Petitioner's claims on the merits, Respondent argues that

Petitioner's claims are untimely under AEDPA's one-year statute of limitations and that

Petitioner's conflict of interest claim is procedurally barred.  (ECF No. 6-1 at 11-15.)

Both arguments rely on Respondent's presumption that "the California Supreme

Court's denial is presumed to rest upon the reasons stated in the court of appeal

opinion," which denied Petitioner's state habeas petition as untimely and without merit.

(Id. at 11 (claiming "the California Supreme Court's summary denial is presumed to rest

upon the reasons stated in the court of appeal opinion") (citing Wilson, 138 S. Ct. at

1192) and 14 (relying for procedural default argument on the statement that "the

California Court of Appeal denied the claims as untimely"); see also Pace v. DiGuglielmo,

544 U.S. 408, 410, 417 (2005) (concluding that a state habeas petition denied for

untimeliness was not "properly filed" such that it tolled the AEDPA statute of

limitations) and Ylst, 501 U.S. at 806 (looking through to the last reasoned state court

decision to find that the petitioner's Miranda claim was procedurally defaulted in state

1  court and not reviewable on federal habeas).  Respondent presumes the Court should

2  look through the California Supreme Court's completely silent denial [ECF No. 7-40], to

3  the reasoned decision of the court of appeal below denying the petition as untimely

4  [ECF No. 7-34].  (ECF No. 6-1 at 5.)  Respondent's arguments follow:  If the petition was

5  found by the state supreme court to be untimely, then (1) AEDPA's one year filing

6  deadline was not tolled during the pendency of the state habeas petitions and the entire

7  federal petition is untimely, (id. at 13), and (2) the conflict-of-interest claim raised in the

8  untimely state petition was procedurally defaulted and cannot be reviewed by this

9  Court, (id. at 14-15).

10       Petitioner, without directly addressing the correctness of Respondent's assertion

11  that the Court should apply the look-through doctrine, argues that the appellate court

12  was incorrect when it found the habeas petition untimely, citing to an exhibit Petitioner

13  first attached to his petition before the state supreme court, which ostensibly

14  demonstrates that Petitioner "never became truly aware of the relevant circumstances

15  [of his conflict-of-interest claim] until post conviction counsel[] reviewed the case."  (ECF

16  No. 1-2 at 32-33.)  With this, Petitioner contends he "establishes that the Court of

17  Appeal's ruling on timeliness was incorrect."  (ECF No. 8 (citing ECF No. 1-2 at 31-32).)

18  Based on these assertions and relying on Evans v. Chavis, 546 U.S. 189 (2006), Petitioner

19  contends that whether the state petitions were timely is "ultimately a legal issue to be

20  resolved by this court."  (Id.)  And finally, that "cause and prejudice" excuse any default.

21  (ECF No. 1-2 at 33-39.)

22       **1.    Applicable law**

23       A state court's determination that a state habeas petition was filed in violation of

24  a state's timeliness requirements can determine whether a subsequent habeas petition

25  can be reviewed in federal court.  This is because of two separate limitations on federal

26  habeas, intended to promote efficiency and comity between state and federal courts.

27       First, AEDPA imposes a one-year statute of limitation on all federal habeas

28  petitions filed by persons in custody pursuant to the judgment of a state court.  28

1  U.S.C. § 2244(d)(1).  This encourages prompt filings and prevents stale claims.  <u>Carey v.</u>

2  <u>Saffold</u>, 536 U.S. 2147, 226 (2002).  As relevant here, where a petitioner is resentenced

3  after appeal, the statute of limitations begins when judgment becomes final after

4  resentencing.  <u>United States v. Colvin</u>, 204 F.3d 1221, 1225 (9th Cir. 2000) (holding that

5  in cases where "we either partially or wholly reverse a defendant's conviction or

6  sentence, or both, and expressly remand to the district court . . . the judgment does not

7  become final, and the statute of limitations does not begin to run, until the district court

8  has entered an amended judgment and the time for appealing that judgment has

9  passed").  In California, the period for direct review expires sixty days after the

10  judgment.  Cal. R. Ct. 8.308(a) (West 2023).  Also relevant here, a petitioner is entitled to

11  statutory tolling during the pendency of any "properly filed" state post-conviction

12  proceedings.  <u>See</u> 28 U.S.C. § 2244(d)(2).  An untimely state habeas petition is not

13  "properly filed" for federal habeas purposes.  <u>See</u> <u>Allen v. Siebert</u>, 552 U.S. 3, 6 (2007).

14  Practically speaking, if a state's high court finds the petitioner's state habeas untimely,

15  the petitioner will not be entitled to statutory tolling during the pendency of those state

16  habeas petitions, which may render the federal petition untimely under AEDPA.  <u>See</u>

17  <u>Pace</u>, 544 U.S. at 417; <u>Bonner v. Carey</u>, 425 F.3d 1145, 1149 (9th Cir. 2005), as amended

18  439 F.3d 993 (9th Cir. 2006).

19      Second, under the doctrine of procedural default, "[a] federal habeas court will

20  not review a claim rejected by a state court 'if the decision of [the state] court rests on a

21  state law ground that is independent of the federal question and adequate to support

22  the judgment.'"  <u>Beard v. Kindler</u>, 558 U.S. 53, 55 (2009) (quoting <u>Coleman v. Thompson</u>,

23  501 U.S. 722, 729 (1991)).  This is to "ensure that state-court judgments are accorded

24  the finality and respect necessary to preserve the integrity of legal proceedings within

25  our system of federalism."  <u>Martinez v. Ryan</u>, 566 U.S. 1, 9 (2012).  In <u>Walker v. Martin</u>,

26  the Supreme Court held that California's timeliness requirement is an independent state

27  ground adequate to bar federal habeas corpus relief.  562 U.S. 307, 315–22 (2011).  The

28  federal habeas court may consider the merits of the defaulted claim only if "the prisoner

1   can demonstrate cause for the procedural default and actual prejudice, or demonstrate

2   that the failure to consider the claims will result in a fundamental miscarriage of

3   justice." <u>Noltie v. Peterson</u>, 9 F.3d 802, 804–05 (9th Cir. 1993); <u>Coleman</u>, 501 U.S. at

4   750.  In summary, if the state supreme court finds the habeas petition before it

5   untimely, the federal court will not be able to reach the merits of habeas claims unless

6   the petitioner shows cause and prejudice.

7         Despite the significant implications of a state court's timeliness determination to

8   federal review of habeas claims, state courts often issue habeas denials unsupported by

9   reasoning or citations.  <u>See Wilson</u>, 138 S. Ct. at 1192 (describing the difficulties federal

10  courts face trying to "find the state court's reasons when the relevant state-court

11  decision on the merits, say, a state supreme court decision, does not come accompanied

12  by those reasons"); <u>Ylst</u>, 501 U.S. at 803 ("The problem we face [identifying the basis for

13  state court orders] arises, of course, because many formulary orders are not meant to

14  convey <u>anything</u> as to the reasons for the decision.  Attributing reason is therefore both

15  difficult and artificial.").  Where the state supreme court issues a silent denial, the

16  United States Supreme Court has said that district courts must apply the look-through

17  doctrine and begin with the premise that "[w]here there has been one reasoned state

18  judgment rejecting a federal claim, later unexplained orders upholding that judgment or

19  rejecting the same claim rest upon the same ground."  <u>Ylst</u>, 501 U.S. at 803.  Application

20  of the look-through doctrine is appropriate "where the court rendering a reasoned

21  decision and a later court making a summary determination were facing precisely the

22  same issue."  <u>Valdez v. Montgomery</u>, 918 F.3d 687, 691 (9th Cir. 2019).  However, this

23  presumption is "not an absolute rule."  <u>Wilson</u>, 13 S. Ct. at 1196 (internal citations

24  omitted).  The court then considers whether factual circumstances show "that the

25  unexplained affirmance relied or most likely did rely on different grounds than the lower

26  state court's decision, such as alternative grounds for affirmance that were briefed or

27  argued to the state supreme court or obvious in the record it reviewed."  <u>Id.</u> at 1192.

28  / / /

1

**2.    Analysis**

Because the last reasoned case in the appellate court found the habeas petition

untimely, the Court first presumes, as Respondent did, that the California Supreme

Court's denial "did not silently disregard that bar and consider the merits." Ylst, 501

U.S. at 803.  The Court then considers whether this presumption can be overcome by

"compelling factual circumstances . . . signaling that the California Supreme Court did

consider and reject the State's timeliness argument." Trigueros v. Adams, 658 F.3d 983,

990 (9th Cir. 2011).  As explained below, the controlling Ninth Circuit case of Trigueros[5]

leads the Court to conclude that look-through presumption is overcome by the facts of

this case, and the California Supreme Court considered Petitioner's state habeas timely.

See Fleming v. Matteson, 26 F.4th 1136, 1141 (9th Cir. 2022) ("Trigueros is binding law. .

. .").

In Trigueros, the Ninth Circuit reviewed a district court's dismissal of a habeas

petition as untimely under AEDPA.  658 F.3d at 985.  Whether the federal petition was

timely was dependent on whether the state habeas petition had been "properly filed"

as required to toll the one-year AEDPA statute of limitations. Id. at 988-89.  The Los

Angeles Superior Court determined that Trigueros had failed to justify the delay of

"approximately two-and-a-half years after his claims of ineffective assistance of counsel

at trial were known to him and approximately eleven months after his conviction

became final," before filing his petition, which was therefore untimely. Id. at 986.  The

court of appeal subsequently denied Trigueros' petition without citation or explanation.

_____

[5] Petitioner did not cite Trigueros v. Adams, 658 F.3d 983 (9th Cir. 2011) in his briefing
before the Court.  (See ECF No. 1-2 at 4-8 (Table of Authorities for Petitioner's
Memorandum of Points and Authorities in Support of Habeas Petition) and ECF No. 8 at
3 (Table of Authorities for Petitioner's Traverse).)  Nevertheless, because Respondent
raised timeliness, which is an affirmative defense, Day v. McDonough, 547 U.S. 198, 208-
09 (2006), and because whether a state habeas petition triggered statutory tolling of the
AEDPA statute of limitations is primarily a legal issue, Trigueros, 658 F.3d at 988, the
court finds it appropriate to consider this case here.

1   Id.  After Trigueros filed his petition with the California Supreme Court, the court

2   requested "an informal response on the merits" from the State.  Id.  The State

3   responded, arguing both that the petition was untimely and without merit, and

4   Trigueros replied.  Id. at 986, 990.  The California Supreme Court then denied Trigueros'

5   petition, again without citation or explanation.  Id. at 986.  Reviewing this record, the

6   federal district court granted the respondent's motion to dismiss the federal habeas as

7   untimely, after applying the look-through doctrine to find that the state court petition

8   was "improperly filed" because it was untimely as explained by the last reasoned

9   decision in the superior court.  Id. at 986-87.

10   The Ninth Circuit reversed, and in reviewing the state court record discussed

11   above, found "the California Supreme Court decided that Trigueros'[] . . . petition was

12   timely, thereby triggering statutory tolling of AEDPA's one-year statute of limitations."

13   Id. at 989.  The compelling factual circumstances that overcame the look-though

14   presumption and supported this conclusion were the California Supreme Court's

15   request for informal briefing on the merits, the submission of briefing on the timeliness

16   issue, and the absence of any citation addressing timeliness in the California Supreme

17   Court's order as contemplated by the California Supreme Court's guidance in In re

18   Robbins, 959 P.2d 311, 340 n.34 (Cal. 1998).  Trigueros, 658 F.3d at 990.  In

19   distinguishing Trigueros' case from an earlier holding applying the look-through

20   presumption, the Ninth Circuit panel stated "Trigueros'[] case is distinguishable . . . in

21   one very important respect: here, the California Supreme Court requested briefing on

22   the merits from the State in response to Trigueros'[] habeas petition."  Id. at 990-91.

23   The same compelling factual circumstances are present in Petitioner's case.  Here,

24   the superior court denied Petitioner's claims on the merits before the appellate court

25   denied them as both untimely and meritless without requiring any briefing from the

26   state.  (ECF No. 7-36 (stating only that "[t]he petition for writ of habeas corpus has been

27   read and considered")); see also Docket in Case No. D078171, Cal. Courts, Appellate

28   Courts Case Info., https://appellatecases.courtinfo.ca.gov/search.cfm?dist=41 (enter

1    case number D078171 and select "Search by Case Number"; select case number

2    "D078171" and then select "Docket").[6]  When Petitioner filed his habeas petition with

3    the state supreme court, he for the first time briefed the timeliness issue and included

4    his habeas attorney's declaration in support thereof.  (ECF No. 7-37 at 24-26, 161-62.)

5    The California Supreme Court then requested an "informal response on the merits"

6    from Respondent.  Docket in Case No. S266021, Cal. Courts, Appellate Courts Case Info.,

7    https://appellatecases.courtinfo.ca.gov/search.cfm?dist=0 (enter case number S266021

8    and select "Search by Case Number"; then select "Docket").  Respondent argued the

9    petition should be denied based on procedural default, untimeliness, and its failure on

10   the merits.  (ECF No. 7-38.)  Petitioner further argued in his reply that his petition was

11   procedurally appropriate and timely.  (ECF No. 7-39.)  Following this briefing pattern,

12   which is similar in every material way to that in <u>Trigueros</u>, the state supreme court

13   denied the petition without citation or comment.  (ECF No. 7-40.)  Any difference

14   between this case and <u>Trigueros</u> only favors Petitioner:  That the superior court first

15   decided Petitioner's claims on the merits suggests that timeliness was not an obvious

16   bar; that Petitioner briefed the issue of timeliness for the first time before the California

17   Supreme Court, which then asked informal briefing on the merits from Respondent,

18   demonstrates that the issue was more fully developed before the supreme court and

19   the fuller record may have supported a different conclusion.

20          Accordingly, the look-through presumption has been rebutted and this Court finds

21   the California Supreme Court deemed Petitioner's state habeas timely.  <u>See</u> Trigueros,

22   658 F.3d at 991; <u>see also</u> <u>Valdez</u>, 918 F.3d at 697 (noting the look-through doctrine does

23   not apply where the claims or issues are not "precisely the same").  Because the

24   California Supreme Court found the state habeas petition timely, Respondent's

25

26   _____

27
     [6] The Court takes judicial notice of Petitioner's cases raising his current claims in the
28   state courts. <u>See</u> <u>In re Korean Air Lines Co.</u>, 642 F.3d 685, 689 n.1 (9th Cir. 2011).

1  timeliness and procedural default arguments fail[7] and the Court will address Petitioner's

2  arguments on the merits.

3  **B.**  **Petitioner's Ineffective Assistance of Counsel Claims Fail on their Merits.**

4  Petitioner raises three ineffective assistance of counsel claims and argues that the

5  denial of each claim by the California Court of Appeal, either on appeal or during habeas

6  proceedings, was contrary to clearly established Supreme Court precedent.  (See ECF

7  No. 1-2.)  Petitioner claims first that he was represented by a conflicted trial attorney in

8  violation of his Sixth Amendment rights.  (Id. at 17.)  Next, Petitioner argues that his trial

9  counsel failed to object to the trial court's modification of a jury instruction and to

10  present a key witness's immunity to the jury.  (Id. at 51-52.)  Lastly, Petitioner argues his

11  counsel failed to object to the prosecutor's repeated misconduct during closing

12  arguments.  (Id. at 64.).

13  **1.**  **Legal standard**

14  The clearly established United States Supreme Court law governing ineffective

15  assistance of counsel claims is set forth in Strickland v. Washington, 466 U.S. 668

16  (1984).  See Baylor v. Estelle, 94 F.3d 1321, 1323 (9th Cir. 1996) (stating that Strickland

17

18  _____

19  [7]  Petitioner's sentence became final on October 11, 2019, the date he was resentenced.

20  See United States v. Colvin, 204 F.3d 1221, 1225 (9th Cir. 2000); (ECF No. 7-37 at 104).
   Because Petitioner did not appeal the resentencing, his judgment became final for

21  federal habeas purposes when the time to appeal expired sixty days later, on December
   10, 2019.  See Cal. R. Ct. 8.308(a); Robinson v. Pickett, No. CV 20-291-AB (KK), 2020 WL

22  374885, at *3 (C.D. Cal. Jan. 23, 2020).  Petitioner is entitled to statutory tolling from the
   filing date in the California Superior Court, August 26, 2020, (ECF No. 7-33), to the date

23  the California Supreme Court denied the petition, July 14, 2021, (ECF No. 7-40), a total

24  of 322 days.  See Campbell v. Henry, 614 F.3d 1056, 1061 (9th Cir. 2010) ("Under
   California's unique system of collateral review, as in any ordinary system of appellate

25  review, if the highest court to render a decision determines that the claim is timely, then

26  that claim was timely when it was before the lower court.").  This tolling extends the
   timeliness deadline under AEDPA to October 28, 2021, making this September 16, 2021

27  petition timely.

28

1  "has long been clearly established federal law determined by the Supreme Court of the

2  United States.").  A petitioner alleging ineffective assistance of counsel must make two

3  showings to prevail: (1) that his attorney's performance was deficient and (2) that the

4  deficient performance prejudiced the petitioner.  Strickland, 466 U.S. at 687.

5  Demonstrating deficient performance of trial counsel "requires showing that

6  counsel made errors so serious that counsel was not functioning as the 'counsel'

7  guaranteed the defendant by the Sixth Amendment."  Strickland, 466 U.S. at 687.  This

8  requirement is met if counsel's "representation fell below an objective standard of

9  reasonableness."  Id. at 688.  Establishing deficient performance requires overcoming a

10  "strong presumption" that counsel "rendered adequate assistance and made all

11  significant decisions in the exercise of reasonable professional judgment."  Id. at 689–

12  90.  Further, a petitioner "must identify the acts or omissions of counsel that are alleged

13  not to have been the result of reasonable professional judgment."  Id. at 690.  "The

14  court must then determine whether, in light of all the circumstances, the identified acts

15  or omissions were outside the range of professionally competent assistance."  Id.

16  "Prejudice" is established by showing "a reasonable probability that, but for

17  counsel's unprofessional errors, the result of the proceeding would have been

18  different."  Id. at 694; see also Lockhart v. Fretwell, 506 U.S. 364, 372 (1993) (deciding

19  the "prejudice" component "focuses on the question whether counsel's deficient

20  performance renders the result of the trial unreliable or the proceeding fundamentally

21  unfair").  A reasonable probability is "a probability sufficient to undermine confidence in

22  the outcome."  Strickland, 466 U.S. at 694.

23  "Surmounting Strickland's high bar is never an easy task."  Padilla v. Kentucky, 559

24  U.S. 356, 371 (2010).  "The standards created by Strickland and section 2254(d) are both

25  highly deferential and when the two apply in tandem, review is 'doubly' so."  Harrington

26  v. Richter, 562 U.S. 86, 105 (2011) (internal citations omitted).  These standards are

27  "difficult to meet" and their application "demands that state court decisions be given

28  the benefit of the doubt."  Cullen v. Pinholster, 563 U.S. 170, 181 (2011).

21cv1626-L (MSB)

1        For each of Petitioner's claims, the Court must identify which, if any, state court

2  opinion is subject to review and generally, the look-through presumption applies.  See

3  Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005) ("Before we can apply [the]

4  standards [of 28 U.S.C. § 2254(d)], we must identify the state court decision that is

5  appropriate for our review.  When more than one state court has adjudicated a claim,

6  we analyze the last reasoned decision.").  While Trigueros compelled this Court's

7  conclusion that the California Supreme Court rejected the appellate court's untimeliness

8  finding as to Petitioner's habeas claims, there are no compelling circumstances that lead

9  this Court to conclude the look-through presumption should not apply to the appellate

10  court's merits determinations on appeal or habeas.  Furthermore, the parties appear to

11  agree that the reasoned opinions of the appellate court are the decisions to be reviewed

12  on federal habeas.  (Compare, e.g., ECF No. 1 at 7-9 (Petitioner arguing that the

13  appellate court's rejection of each of his claims was contrary to established Supreme

14  Court precedent) with ECF No. 6-1 at 16, 18, 20-21 (arguing the state appellate court's

15  findings are reasonable and entitled to deference).)

16      **2.    Petitioner is not entitled to relief based on his conflict-of-interest claim.**

17        Petitioner argues that trial counsel's "previous, yet ongoing representation of the

18  state's key witness" caused him to "pull punches" when cross-examining Daniels and

19  thus Mr. Jordan failed to fully attack Daniels' credibility.  (ECF No. 1-2 at 43-44.)

20  Particularly, Petitioner states that Mr. Jordan did not inquire into several circumstances

21  that would have undermined Daniels' credibility, including that she testified under a

22  grant of immunity.  (Id. at 45.)  Petitioner also argues that the conflict-of-interest waiver

23  was invalid because it was confusing, did not adequately address the possible

24  consequences of the conflict, and the court did not appoint independent counsel to

25  advise Petitioner or adequately inquire into the conflict to provide Petitioner adequate

26  warning of the possible consequences.  (Id. at 43, 47, 49.)

27       Respondent contends that Mr. Jordan was not representing Daniels and

28  Petitioner at the same time, and without showing concurrent representation Petitioner

1   is not entitled to relief.  (ECF No. 6-1 at 15-16.)  Further, Respondent maintains that

2   even if there was a conflict of interest, Petitioner waived the issue and has failed to

3   show how loyalty to Daniels affected his counsel's performance.  (Id. at 16.)

4               i.     Relevant factual background

5         In this case, Petitioner was convicted of the March 14, 2013 drive-by murder of

6   Xavier Fox, among other things.  (ECF No. 7-1 at 43; ECF No 7-5 at 57-64.)  Petitioner was

7   not charged with the Fox murder until over two and a half years after it occurred, in

8   November 2015.  (ECF No. 7-1 at 42.)  The prosecution witness who Petitioner's trial

9   counsel, Jonathan Jordan, previously represented causing the alleged conflict at-issue

10  here is Petitioner's former common-law wife, Margie Daniels.  (See ECF No. 1-2 at 17-23

11  (Petitioner's statement of facts underlying conflict-of-interest argument); ECF No. 7-2 at

12  97-99 and ECF No. 7-3 at 1-4 (prosecution's trial brief describing Daniels' role in the

13  case).)

14        On February 12, 2014, nearly one year after the Fox murder, Daniels and

15  Petitioner were arrested in Riverside County for a conspiracy to steal used cell phones

16  from a kiosk.  (Id. at 97.)  Daniels reached out to law enforcement, seeking to provide

17  information about the 2011 murder of Cordell King in San Diego, stating that she had

18  been in a relationship with the driver at the time of the murder and had significant

19  information about what occurred.  (Id.)  Detectives attempted to ask her about the Fox

20  murder, which they suspected Petitioner of committing, but Daniels denied any

21  knowledge.  (Id.)  Daniels pled guilty to charges in Riverside, represented by counsel

22  other than Jordan.  (ECF No. 7-12 at 6-7.)  Ms. Daniels was released from jail in Riverside

23  County and returned to San Diego.  (ECF No. 7-17 at 127-28.)

24        Police arrested Daniels in San Diego County on April 9, 2014, two months and one

25  week after the Riverside arrest.  (Id. at 128.)  She was arraigned on a complaint that

26  charged thirty counts of theft and conspiracy.  (ECF No. 7-1 at 98.)  Mr. Jordan

27  represented Margie Daniels in her San Diego theft case and assisted her cooperation as

28  a witness regarding the King murder.  (See ECF No. 7-4 at 98-99; ECF No. 7-37 at 88-89.)

On June 24, 2014, Daniels participated in a "free talk" with the San Diego District Attorney's Office while represented by Jordan, where she provided information about the King murder. (Id.) The following month, on July 25, 2014, Daniels entered a cooperation agreement, wherein she pled guilty to four counts each of commercial burglary and conspiracy to commit theft, with a stipulated sentence of seven years, eight months. (Id.) Pursuant to the cooperation agreement, Daniels was released on her own recognizance and participated in several undercover operations that helped law enforcement solve the King murder. (Id.)

On December 2, 2015, armed with information ostensibly connecting Ms. Daniels to the destruction of evidence police believed Petitioner used in the Fox homicide, San Diego police officers arrested Ms. Daniels as an accessory after the fact to the crime. (Id.) Officers questioned Daniels without counsel, and after repeatedly denying knowledge, Daniels disclosed that she had picked Petitioner up immediately following the Fox murder at his aunt's house near the scene, she had seen his Range Rover parked there, Petitioner was acting strange at the time and did not want to go home, and that Petitioner later admitted to her that he had killed Fox and explained his motivation. (Id. at 99; see also ECF No. 7-4 at 2-84 (transcript of interview, admitted into evidence as a trial exhibit).) Daniels also agreed with agents that Petitioner knew the police were onto him when they started following his Range Rover around and Petitioner arranged for a drug user from the neighborhood to burn his Range Rover. (ECF No. 7-4 at 59, 78-79.) Daniels said that Petitioner took apart the gun used in the homicide and threw the pieces into the marina at different locations. (Id. at 85-86.) Daniels said that to create an alibi, Petitioner had asked her to lie if the police ever questioned her about Petitioner's calls to her that day. (Id. at 82-83.)

After giving this statement, Daniels called Mr. Jordan, but Mr. Jordan informed her that he was already representing Petitioner and therefore could not represent Daniels. (ECF No. 7-37 at 88.) Jordan referred Daniels to his friend, Gastone Bebi. (Id.)

The District Attorney's Office dismissed the accessory to murder charges against Daniels on December 31, 2015, after Daniels' statements were corroborated by further investigation.  (ECF No. 7-2 at 99; ECF No. 7-17 at 154.)  Daniels was represented at the January 11, 2016 preliminary hearing by Gastone Bebi.  (ECF No. 7-1 at 38.)  She testified at the preliminary hearing under a grant of use and derivative use immunity.  (Id.)  The state court sentenced Daniels, who was then represented by counsel other than Jordan, for the theft-related charges on September 26, 2016.  (ECF No. 7-3 at 4; ECF No. 7-12 at 42.)  The prosecutor represented to the trial judge in Petitioner's case that "[a]s a result of her cooperation with law enforcement, which lead to SDPD solving two separate homicides, her conduct while out of custody pending sentencing in this case, and in consideration of her criminal record, the People stipulated that Ms. Daniels receive a [five] years prison commitment, executed and suspended with standard conditions of probation."  (Id.)

Before Petitioner's trial began, both prosecution and defense counsel raised Jordan's previous representation of Daniels before the trial judge.  The prosecutor filed a Trial Brief and Motions in Limine on October 25, 2016.  (ECF No. 7-2 at 90 to ECF No. 7-3 at 25.)  In the briefing, the prosecutor summarized Daniels' relationship with Petitioner, her history of arrests and cooperation with law enforcement, and her statements related to Petitioner's case.  (ECF No. 7-2 at 97 to ECF No. 7-3 at 5.)  The prosecutor moved in his fifth in limine motion "to address the fact that defense counsel previously represented a material witness who will testify in this trial."  (ECF No. 7-3 at 16.)  The prosecutor stated he "fully expected Mr. Jordan to challenge the credibility of Ms. Daniels' testimony thoroughly," including her "relationship with law enforcement, and discussing how that relationship began, the benefits she received as a result of that relationship, etc."  (Id.)  Given the unusual circumstances, the prosecutor sought the Court's guidance before trial.  (Id.)

At the October 25, 2016 hearing on the motions in limine, Mr. Jordan provided the Court with Petitioner's signed conflict waiver form.  (See ECF No. 7-12 at 1, 5.)  The

1  trial judge questioned Jordan about his prior representation of Daniels, clarifying that

2  Jordan had never represented Petitioner in the prior case, and that he "represented

3  [Daniels] formerly unrelated to this case with [Petitioner]." (Id. at 5-7.)  When asked by

4  the court if he understood "all the different ramifications of that prior representation"

5  and whether he was "willing to waive any conflict that might arise from that," Petitioner

6  responded, "Yes." (ECF No. 7-12 at 8.)  The Court discussed concerns regarding whether

7  the jury might learn that Jordan represented Daniels previously and whether there

8  would be any limitations on Jordan's ability to cross examine Daniels. (ECF No. 7-12 at

9  5-11.)

10       The Court and counsel agreed that Jordan would be able to cross-examine Ms.

11  Daniels as to "the victim witness program and any benefits that are provided to any

12  witness that's testifying that received benefits from the DA's office." (Id. at 9-10.)  The

13  prosecutor was concerned Jordan would not be able to ask Daniels about the

14  "formation" of her relationship with the prosecutor's office, and Mr. Jordan confirmed

15  that, strategically, he did not intend to explore the formation of the relationship. (Id. at

16  10.)  The Court planned to admonish Daniels not to reveal her prior relationship with

17  Jordan prior to her testimony. (Id. at 11; see also ECF No. 7-17 at 106-08 (the Court

18  giving the admonishment at trial).)  The Court did not rule on which of Daniels' prior

19  convictions could be used for impeachment, but instead directed counsel to meet and

20  confer on that issue. (Id. at 37-38.)  Both counsel and the judge agreed that Jordan

21  could cross examine Daniels about an incident where she posted information about a

22  third party online, thereby putting that third party in danger. (Id. at 38-41.)  Finally, the

23  judge resisted taking a position on whether Jordan had any duty to obtain a conflict

24  waiver from Daniels, finding no issue for Petitioner's trial because Petitioner had waived

25  any conflict. (Id. at 43.)

26       Ms. Daniels testified for the prosecution in Petitioner's trial on November 1, 2016.

27  (ECF No. 7-17 at 68.)  She testified that Petitioner believed rival gang members had

28  burned his Camaro in January 2013, and he stated he was going to "'F,' whoever did it,

up." (Id. at 85-88.)  Regarding the day of the Fox homicide, Daniels confirmed she was in Chula Vista when she received a call from Petitioner at 12:19 p.m., asking her to pick him up at this aunt's house.  (Id. at 89-92.)  She did not recall whether she saw Petitioner's Range Rover when she picked him up there.  (Id. at 93-94.)  She dropped Petitioner off at his brother's house and went back to Chula Vista.  (Id. at 94-95.) Daniels said she and Petitioner spent that night at his brother's house, and Petitioner was quiet.  (Id. at 95-97.)  She explained that she did not know anything about the Fox murder when homicide detectives searched the home she shared with Petitioner on two different occasions, and when a detective told her that if she did not help law enforcement with the Fox murder, she and her kids would get caught in the middle.  (Id. at 97-100.)

When the prosecutor began to ask Daniels about what happened to Petitioner's Range Rover, Daniels explained she had lied in her December 2, 2015 statement that Petitioner had his Range Rover burned.  (Id. at 111.)  Daniels arguably confirmed that Petitioner had admitted to her that he was responsible for the Fox murder, but ambiguously denied asking Petitioner questions about Fox.  (Id. at 116-19.)

The prosecutor next asked Daniels about her Riverside and San Diego theft charges and her cooperation agreement with the District Attorney's office, wherein she shared information and assisted in gathering evidence regarding the King murder to reduce the penalty she could suffer based on her theft charges.  (Id. at 121-31.)  Daniels discussed her participation in witness protection, her sentence in the theft cases, and her status as a probationer with a suspended sentence.  (Id. at 132-33.)

During direct examination regarding Daniels' December 2, 2015 statement to law enforcement, the prosecutor asked Daniels several questions about whether she had "anything to do with burning the Range Rover" and what she had heard about the issue. (Id. at 137-38.)  Eventually, the Court recessed, and Daniels expressed concern about whether she could expose herself to liability for the Range Rover.  (Id. at 138-39.)  The Court gave Daniels an opportunity to consult with Gastone Bebi, who then advised the

1    Court Daniels had a basis for asserting her Fifth Amendment right not to incriminate

2    herself.  (Id. at 139-43.)  The prosecutor requested, and the Court ordered, Daniels be

3    compelled to testify by a grant of immunity under Penal Code section 1324.  (Id. at 143-

4    47.)  The Court explained that while the compelled testimony and any information

5    directly or indirectly derived therefrom could not be used against Daniels in any criminal

6    case, she was still subject to prosecution for perjury, false testimony, or contempt.  (Id.

7    at 147.)

8        Upon resuming testimony before the jury, Daniels testified that because the

9    Range Rover had been broken and they lacked the money for repairs, she—not

10   Petitioner—had arranged for the Range Rover to be burned.  (Id. at 150.)  Daniels also

11   testified that her statement about the gun had been wrong—she had not seen

12   Petitioner take the gun apart.  (Id. at 152-53.)  Daniels admitted that her cooperation

13   agreement related to the King case also required that she "cooperate generally and

14   provide information to the DA's office and to the San Diego Police Department about

15   other crimes about which [she] had information," and that she remained in custody

16   even after she was dismissed from the Fox murder case until she testified at the

17   preliminary hearings because of that agreement.  (Id. at 155.)

18       Jordan cross-examined Daniels over the course of two trial days.  (ECF Nos. 7-17,

19   7-18.)

20           ii.    State court decision

21   The Court of Appeals, in the decision here under review, found:

22       The petition also fails to state a prima facie case for habeas corpus
         relief.  (See People v. Duvall (1995) 9 Cal.4th 464, 474.)  Jackett waived the
23       conflict of interest of which he now complains.  A criminal defendant may
         validly waive a conflict of interest if the trial court is satisfied the defendant
24       discussed with counsel, or with another attorney if the defendant wishes,
         the potential drawbacks of representation by counsel who has a conflict of
25       interest; has been advised of the potential dangers of such representation in
         his case; and voluntarily waives the conflict.  (People v. Mai (2013) 57 Cal.4th
26       986, 1010).  Jackett signed a waiver of conflict of interest form that generally
27       described the potentially conflicting duties of loyalty and confidentiality that
28

25

may arise when a lawyer represents a client whose interests are adverse to those of a former client, advised him to think carefully about the conflict, and suggested consultation with independent counsel to ensure proper representation. Before the trial court accepted Jackett's waiver of the conflict, the court discussed with the prosecutor, Jackett, and his counsel the nature of the conflict, including the potential limitation on the scope of Jordan's cross-examination of Daniels about her cooperation with the prosecution in the cases in which he had represented her. Jordan told the court he had discussed the waiver form with Jackett several times, and when asked by the court Jackett said he understood "all of the different ramifications" of Jordan's prior representation of Daniels and was "willing to waive any conflict that might arise from that."  Jackett did not ask any questions or request independent counsel to advise on whether he should waive the conflict of interest.  Jackett thus "was aware of the potential drawbacks and possible consequences of retaining [Jordan], . . . understood his right to conflict-free counsel and knowingly waived that right."  (People v. Sanchez (1995) 12 Cal.4th 1, 48.)

Even if Jackett had not waived the conflict of interest arising out of Jordan's prior representation of Daniels, he has not stated a prima facie claim for relief based on the conflict.  "Essentially, a claim of conflict of interest constitutes a form of ineffective assistance of counsel."  (People v. Perez (2018) 4 Cal.5th 421, 435.)  To prevail on his claim, Jackett must show Jordan had an actual conflict of interest that prevented him from adequately attacking Daniel's credibility, and absent the conflict there is a reasonable probability the result of the trial would have been different.  (Mickens v. Taylor (2002) 535 U.S. 162, 166, 171; People v. Mai, supra, 57 Cal.4th at p. 1010; People v. Doolin (2009) 45 Cal.4th 390, 421, 428.)  Jackett cannot make the second showing because Daniels's dishonesty and bias were adequately exposed at trial.  Daniels testified Jackett was the father of one of her children and they lived together with her other children as a family.  She told the police Jackett admitted killing the victim, but at trial she testified she could not remember.  Daniels also told the police Jackett had somebody burn his vehicle after the murder and she was not involved; but at trial, after having been given a grant of immunity, she testified she burned the vehicle to collect insurance proceeds.  Jordan cross-examined Daniels about the inconsistencies between her statements to police and her testimony at trial and obtained testimony about how distraught she was during the police interview because police had taken her two-week-old baby and threatened to charge her as an accessory to the murder Jackett committed.  The prosecutor and Jordan both argued Daniels's bias and credibility to the jury.

The issue of Daniels's credibility was thus adequately presented to the jury, and it is not reasonably probable that had Jordan cross-examined her cooperation with the prosecution in the other cases or her immunity in Jackett's case, the result of the trial would have been different. (Mickens, at p. 166; Doolin, at p. 430.)

(ECF No. 7-36 at 4-6.)

   iii. Analysis

  A criminal defendant is entitled under the Sixth Amendment to representation free from conflicts of interest. Wood v. Georgia, 450 U.S. 261, 271 (1981). To establish a Sixth Amendment violation based on a conflict of interest, "a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." Cuyler v. Sullivan ("Sullivan"), 446 U.S. 335, 348 (1980). An "actual conflict" means "a conflict of interest that adversely affects counsel's performance," rather than "a mere theoretical division of loyalties." Mickens v. Taylor, 535 U.S. 162, 171, 172 n.5 (2002). When this standard is met, prejudice is presumed because the "assistance of counsel has been denied entirely or during a critical stage of the proceeding." Id. at 166. In other words, it is an exception to the usual requirement to show Strickland prejudice for a Sixth Amendment violation. Id. "However, in Mickens, the Supreme Court explicitly limited this presumption of prejudice for an actual conflict of interest (also known as the 'Sullivan exception') to cases involving 'concurrent representation.'" Rowland v. Chappell, 876 F.3d 1174, 1192 (9th Cir. 2017) (citing Mickens, 535 U.S. at 175); see also Earp v. Ornoski, 431 F.3d 1158, 1184 (9th Cir. 2005) ("The Mickens Court specifically and explicitly concluded that Sullivan was limited to joint representation[.]").

  Petitioner suggests his counsel labored under an actual conflict; however the petition and facts do not support such a conclusion. To the extent that Petitioner argues that Jordan's representation of Daniels was "ongoing," (see ECF No. 1-2 at 45 (describing Jordan's representation of Daniels as "previous, yet ongoing) and ECF No. 8 (claiming that Jordan represented Daniels in her other cases while he represented

Petitioner in this case)), the record does not demonstrate concurrent representation. Margie Daniels' declaration, on which Petitioner relies, is vague on these issues. Regarding Jordan's earlier representation of Daniels when she was a cooperating witness in the King homicide case against her ex-girlfriend and others, Daniels stated that Jordan negotiated a deal with the District Attorney's Office wherein she was "placed in the witness protection program and receive[d] payments" – an "arrangement [that] was ongoing throughout [Petitioner's] trial." (ECF No. 7-37 at 88.)  Without identifying a single date that coincided with the case against Petitioner, Daniels stated that Jordan helped arrange her meeting with prosecutors in that case, was present during meetings with the District Attorney when she was in custody and was "always there to help [her] with problems or questions." (Id.)  Though she states the burglary case that Jordan represented her in was "close in time to [Petitioner's] case," and that she was sentenced in the burglary case after she testified at the preliminary hearing in Petitioner's case, she does not state that Jordan represented her at the sentencing or continued to represent her after he began to represent Petitioner in the instant case. (See id.)

Instead, the trial record demonstrates only what Petitioner claimed in his Petition, that Jordan "previously represented the state's key witness, Margie Daniels, and parts of her prior case were still going on." (ECF No. 1 at 7.)  Daniels' trial testimony verified that she was arrested in San Diego on April 9, 2014, and it was during that detention that she and [Jordan] met with a deputy district attorney on June 24 before entering a cooperation agreement to assist with the King murder on July 25, 2014.  (ECF No. 7-17 at 130-32.)  On October 25, 2016, at the in limine motion hearing shortly before trial commenced, the Court discussed Jordan's prior representation of Daniels.  (ECF No. 7-12.)  Jordan clarified that he customized the waiver form Petitioner signed because it was originally designed to address concurrent representation, whereas Jordan had represented Daniels before in an unrelated case.  (Id. at 7.)  When describing the timeline to the trial court, the prosecutor stated that Daniels had other counsel (not

Jordan) represent her at the preliminary hearing, and "[o]ther counsel represented her through the extent of the sentencing [in her burglary-related case]."  (ECF No. 7-12 at 42.)  When Gastone Bebi was summoned to court to consult with Daniels about whether she could incur liability for her testimony regarding the Range Rover, he explained that his attorney-client relationship with Daniels ended "when she was last sentenced," indicating that he had represented her at sentencing in her burglary case.  (See ECF No. 7-17 at 142.)  Petitioner cites no authority for the suggestion that any conflict was created by Jordan's "friend," Gastone Bebi, representing Daniels after Jordan informed her of the conflict.  (See ECF No. 8 at 9.)  Because Petitioner has not clearly alleged or shown concurrent representation, Petitioner does not benefit from a presumption of prejudice.  See Mickens, 535 U.S. at 175.

Petitioner identifies three key credibility topics he asserts Jordan failed to cross examine Daniels on due to his alleged conflict: (1) her witness protection status on the King murder, (2) her prior conspiracy /burglary conviction for which she was on probation, facing a potential sentence of seven years, eight months if she violated probation, and (3) her immunity in the present case.  (ECF No. 1 at 7.)  But the California Court of Appeal reasonably found that Petitioner did not suffer prejudice, even if there was a conflict that Petitioner did not waive, because Daniels' credibility was sufficiently exposed and argued to the jury.  (ECF No. 7-37 at 159-60.)

The Court first notes that both the first and second topics Plaintiff identifies were placed before the jury on direct and cross examination.  Daniels testified about her Riverside and San Diego arrests and her cooperation agreement with the District Attorney's office, wherein she shared information and assisted in gathering evidence regarding the King murder to reduce the penalty she could suffer based on her theft charges.  (ECF No. 7-17 at 121-31; 171-74.)  Daniels discussed her participation in witness protection, her plea to "eight different felony counts of theft and conspiracy to commit theft," her seven-year-and-eight-month sentence in the theft cases, and her status as a probationer with that sentence hanging over her head.  (Id. at 132-34, 157-

58, 175.)  Jordan also cross-examined Daniels about her cooperation against her former

girlfriend regarding the King murder to avoid jail time on her theft-related charges and

the benefits she received in the witness protection program.  (Id. at 169-75.)  The

prosecutor again followed up about Daniels' cooperation in the King murder on redirect.

(ECF No. 7-18 at 44, 47-48.)

Jordan also questioned Daniels generally about her truthfulness in many other

ways.  For example, he questioned her about times she had lied or contradicted herself,

(see, e.g., id. at 164, 187, 189; ECF No. 7-18 at 19, 21, ), and times she had engaged in

theft or other crimes, (id. at 166, 168, 174).  Jordan questioned Daniels about exposing

her ex-girlfriend as a snitch in an act of revenge and suggested that Daniels had lied

about Petitioner to get him locked up and away from Daniels.  (Id. at 32-35.)  Jordan also

exposed Daniels' fear of going to jail, and willingness to implicate her former lovers in

homicides to avoid it.  (Id. at 169, 173)

Regarding Daniels' statements to police, when she first admitted knowledge of

Petitioner's involvement in the Fox homicide, Jordan elicited testimony that Daniels was

surprised by her arrest on accessory to murder charges when she went with her two-

week old baby to collect a witness protection check from the police station.  (Id. at 175-

78.)  Daniels said she broke down, was afraid of going to jail, and was worried about

whether she would see her baby again.  (Id. at 178-80.)  Jordan brought out the fact that

Daniels was telling officers what she believed they wanted to hear about Petitioner, and

that she lied and embellished to give them what she believed they wanted so that she

could avoid prosecution for the accessory charge.  (ECF No. 7-18 at 21-30.)  Jordan

emphasized that Daniels had permitted police to believe Petitioner rather than Daniels

had arranged the burning of the Range Rover, because she "didn't want to get in

trouble."  (Id. at 181.)  He emphasized that Daniels did not recall details that officers had

not told her about the day Fox was killed, or details about the surrounding days.  (Id. at

24-32.)  He led Daniels to admit that the screenshots she had provided police that

purportedly showed Petitioner being mocked on social media for not retaliating against

1   the person who burned his Camaro before the Fox murder, had instead been people

2   mocking Petitioner <u>months after</u> the Fox murder.  (<u>Id.</u> at 62-72.)

3        For the reasons discussed in the next section, the Court also finds no prejudice

4   from Jordan's lack of cross examination regarding the Court's grant of immunity to

5   Daniels prior to her testimony implicating herself in the burning of the Range Rover.

6        Considering the totality of Daniels' testimony and cross-examination, the

7   California Court of Appeal reasonably concluded that Petitioner did not show a

8   likelihood that the result of the trial would have been different absent the alleged

9   conflict because Daniels's credibility was adequately explored.

10       Petitioner fails to provide any authority from the United States Supreme Court, or

11   even any federal circuit court, to support his additional argument that the California

12   court's finding that Petitioner waived any conflict of interest, (<u>see</u> ECF No. 7-37 at 111-

13   12), was contrary to clearly established Supreme Court precedent.  Instead, Petitioner

14   cites exclusively to California state court cases to support his argument that the

15   Petitioner's waiver was invalid absent the Court appointing independent counsel to

16   advise Petitioner on the conflict and more thorough inquiry from the Court.  (<u>See</u> ECF

17   No. 1-2 at 47-50, ECF No. 8 at 11 (both Petition and Traverse failing to provide any

18   relevant federal authority on these points).)  In any event, because the Court of Appeal's

19   opinion that there was no prejudice is reasonable based on the record, it is not

20   necessary to consider whether Petitioner effectively waived any conflict.

21   **3.    Petitioner is not entitled to relief based on trial counsel's failure to object**

22   **to a jury instruction modification and disclose Daniels's immunity to the**

23   **jury.**

24       As noted above, the prosecution requested, and the court granted, immunity to

25   Daniels under section 1324[8] in the middle of her trial testimony.  (ECF No. 7-17 at 143-

26   _____

27

28   [8] Section 1324 allows a prosecuting agency to request during criminal proceedings that the court
     compel a witness to answer a question after the witness has asserted the privilege against self-

44.)  Mr. Jordan requested permission to cross-examine Daniels on the grant of immunity and the court initially hesitated to allow the questioning, but ultimately allowed Mr. Jordan to cross-examine Daniels regarding the immunity grant and any impact it had on her testimony.  (ECF No. 7-17 at 144-46, ECF No. 7-18 at 14-15.)  The court also discussed jury instructions at that time and noted that allowing the jury to consider immunity in assessing a witness's credibility was most applicable to situations where immunity was granted prior to trial, not under section 1324, though she thought it was still applicable.  (Id. at 14.)  The trial court also noted that the immunity had to be relevant, and at that time, the only identified relevance of the immunity pertained to Daniels' testimony regarding the Range Rover.  (ECF No. 7-17 at 194 ("Well, I think we have to keep it in the context of how it arose.  This arose with her reluctance to say something about the Range Rover.  If there arises later some other issue, then we will deal with it.").)  Daniels' immunity never came to light during trial.  (See ECF No. 7-30 at 17.)

At the close of trial, the court instructed the jury using CALCRIM 226, which concerns witness testimony.  (ECF No. 7-5 at 13-15; ECF No. 7-20 at 70-72.)  In a list of factors that the jury could consider in determining a witness's credibility, the court excluded an optional factor which states, "Was the witness promised immunity or leniency in exchange for his or her testimony?"  Compare (ECF No. 7-20 at 70-72) with CALCRIM No. 226.

Petitioner asserts that his trial counsel was ineffective when he failed to take advantage of the trial court's permission to inquire into Daniels' grant of immunity, and then did not object to the trial court's omission of the immunity part of the instruction.  (ECF No. 1-2 at 55.)  Petitioner argues that there was no tactical reason for trial counsel

incrimination and provides that "no testimony or other information compelled under [this section] or any information directly or indirectly derived from the testimony or other information may be used against the witness in any criminal case."  Cal. Penal Code § 1324 (West 2023).

to not request inclusion of the immunity factor or bring it up during trial, especially because trial counsel's entire strategy revolved around discrediting Daniels.  (Id. at 59.) But for this error, Petitioner argues, he would have received a more favorable outcome because the prosecution would have been forced "to devise an entirely new scheme to attempt to persuade the jurors to believe the sole witness to [P]etitioner's confession who was both a paid informant and admitted perjurer."  (Id. at 61.)

Respondent defends the California Court of Appeal's denial, stating that Petitioner offered no evidence regarding his counsel's approach to cross-examination and the record does not preclude a valid tactical purpose for not introducing evidence regarding the grant of immunity.  (ECF No. 6-1 at 18.)  Respondent argues the appellate court correctly found possible tactical reasons existed not to place Daniels' immunity before the jury.  (Id.)

Specifically, the Court of Appeals, in the decision here under review, found:

> Here, Jackett's ineffective assistance claim does not overcome the first prong of the Strickland test.  First, there was no evidence before the jury to support instructing with the optional factor regarding immunity; thus, defense counsel reasonably decided that there was no need to request the instruction.  (People v. Kearns (1997) 55 Cal.App.4th 1128, 1135 [evidence was insufficient to permit a reasonable jury to find that all elements of the necessity defense were established and thus counsel did not commit error in failing to request an instruction].)

> Second, we also reject Jackett's suggestion that defense counsel provided ineffective assistance for failing to introduce evidence of the immunity grant.  The record does not show that defense counsel was ever asked to explain why he failed to introduce this evidence and there are satisfactory explanations for this failure.  For example, in her earlier statements to police, Margie vehemently denied having the Range Rover burned and suggested that Jackett had the Range Rover burned—evidence that the jury could have considered as showing his consciousness of guilt. (People v. Hart (1999) 20 Cal.4th 546, 620 [an attempt to destroy or suppress evidence is sufficient to instruct jury that it can infer a consciousness of guilt].)  However, in trial testimony, Margie testified that she lied to police about Jackett having the Range Rover burned; she now admitted to burning the Range Rover to collect insurance money.  Defense counsel may have

33

decided that introducing evidence that Margie was testifying under a grant of immunity would undercut the credibility of her trial testimony that she— and not Jackett—caused the Range Rover to be burned.  Moreover, at trial, Margie did not repeat her earlier claim to police that Jackett had killed the victim.  Counsel's strategy of not offering evidence that may have undercut Margie's trial testimony is not constitutionally deficient just because it did not work.  (Harrington v. Richter (2011) 562 U.S. 86, 109 [defense counsel is not incompetent merely because "the defense strategy did not work out as well as counsel had hoped"].)

We "will reverse convictions on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission.'" (People v. Fosselman (1983) 33 Cal.3d 572, 581.)  Because Jackett has not shown that " ' "there simply could be no satisfactory explanation" ' " (People v. Mendoza Tello (1997) 15 Cal.4th 264, 266-267) for deciding not to present this evidence, his claim of ineffective assistance is more appropriately decided in a habeas corpus proceeding.  (Ibid).

(ECF No. 7-30 at 22-24.)

The crux of Petitioner's argument is that the appellate court's determination that Petitioner failed to show deficient performance at step one was contrary to Strickland. (ECF No. 1-1 at 58-62.)  Petitioner claims that trial counsel's focus on discrediting Daniels, as demonstrated by his closing argument that "constructed [P]etitioner's defense on an attack of the credibility of Daniels," demonstrates there was no tactical reason to not further discredit Daniels with evidence of her immunized testimony.  (ECF No. 1-2 at 61.)  However, Petitioner does not cite to any clearly established federal law to support this claim and the Court is not persuaded that the appellate court's decision was unreasonable.

First, that trial counsel fought for the opportunity to present the immunity evidence, (see ECF No. 7-17 at 144-46; ECF No. 7-18 at 859-63), suggests that he was aware of and considered its potential use for impeachment.  Jordan specifically stated, after advocating for a ruling that would permit him to disclose the immunity the Court bestowed on Daniels, "I don't want to tell the Court what I am going to do or not going

1 to do.  If I get some sort of ruling from the Court, it will help me decide and I may

2 change my mind."  (ECF No. 7-18 at 861.)

3      Second, the nature of the Court's ruling limited the ways Jordan could use the

4 Court's grant of immunity.  During Jordan's cross-examination of Daniels, the trial court

5 revisited its earlier ruling excluding evidence of Daniels' immunity, and instead held that

6 Jordan could explore the immunity in a limited fashion.  (Id. at 14-15.)  More specifically,

7 the Court indicated Jordan could introduce the Court's order in a manner that revealed

8 Daniels' initial testimony was not immunized, and the Court ordered her to testify with a

9 grant of immunity immediately prior to Daniels changing her testimony about the Range

10 Rover.  (Id. at 15-16.)  For instance, the Court suggested Jordan could ask "if that

11 affect[ed] her[, or] if she changed her testimony because of it."  (Id. at 16.)

12      Because of these circumstances, it is conceivable trial counsel chose not to

13 introduce the immunity granted by the Court after considering his options in

14 preparation to continue his cross-examination of Daniels.  Exposing that immunity

15 would have highlighted that Daniels could not face criminal charges based on her

16 admitted role arranging to have Petitioner's Range Rover burned for insurance money,

17 which contradicted her earlier claim to police that Petitioner did it to destroy evidence

18 linking him to the murder.  Since Daniels had made it clear through her testimony at trial

19 that she did not want to be a witness against Petitioner, (see, e.g., 7-17 at 68-69, 104-

20 05, 118, 135, 156), a reasonable concern would be that the jury might believe Daniels'

21 trial admission regarding Petitioner's car was a lie meant to protect Petitioner.  (See ECF

22 No. 7-18 at 14 (trial court discussing "there is some logic behind a concept that an

23 immunized witness's testimony may not be as trustworthy as a nonimmunized witness's

24 testimony") (citing People v. Hampton, 73 Cal.App.4th 710, 723 (1999).)  It is reasonable

25 that the California Court of Appeal denied Petitioner's ineffective assistance of counsel

26 claim under Strickland on the basis that the Daniels' immunized admission at trial

27 benefitted the defense and therefore there were potential tactical reasons for counsel

28 to have left Daniels' immunity out of the record.  It follows that the California Court of

Appeal was not unreasonable in finding trial counsel was not deficient for allowing the Court to omit the immunity factor from its witness credibility instruction, since counsel did not place evidence of the same in the record.  Considering trial counsel's other efforts to discredit Daniels as previously discussed, Petitioner has not overcome the heavy burden of showing that there was no strategic reason for counsel to omit evidence of Daniels' immunity.  See Yarborough v. Gentry, 540 U.S. 1, 5 (2003) (recognizing a strong presumption that counsel took actions "for tactical reasons rather than through sheer neglect"); Strickland, 466 U.S. at 689 ("There are countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way.").

**4.      Petitioner is not entitled to relief based on trial counsel's failure to object to the prosecution's closing argument.**

Petitioner takes issue with the prosecutor's assertion in closing argument that Daniels' testimony must have been truthful because she admitted to conspiracy to commit arson and insurance fraud, which demonstrated how seriously she took her oath.  (ECF No. 7-20 at 111-12.)   Referencing Daniels, the prosecutor stated:

> I mean, think about what she admitted, and we'll talk about it a little bit. She admitted to conspiracy to commit arson. She didn't have to come in here and own up to being a part of this conspiracy. She could have stuck to her self-preservation where she was talking about Ty getting the smoker to burn the Range Rover.
>
> She could have—how hard would it have been for her to just stick to this and tell you, yea, he got a smoker. She wasn't going to do that. She took her oath seriously. And there was that moment where she paused, she hesitated, she asked the court a couple questions of "Can I ask you a question?' We took a little break. She came back, and she basically owned up to "It wasn't him who recruited the smoker, it was me. I was in on it. I thought it was insurance." But she basically owned up to conspiracy to commit arson, conspiracy to commit insurance fraud. These are things that I would encourage you to think about.

(Id.)

1    Petitioner claims that (1) the prosecutor falsely implied that Daniels had exposure

2    to criminal prosecution arising from her trial testimony, (2) concealed and

3    misrepresented the fact that Daniels had immunity preventing her prosecution for those

4    crimes, and (3) deceptively urged the jury to conclude that Daniels' admission to

5    criminal activity was evidence of her desire to be truthful.  (ECF No. 1-2 at 64-65.)

6    Petitioner alleges that trial counsel's failure to object to the prosecutor's statements

7    allowed these misrepresentations to infect the entire trial with unfairness and clearly

8    prejudiced Petitioner.[9]  (Id. at 72.)

9    Respondent answers that the California Court of Appeal was reasonable in

10   concluding that counsel was not ineffective because the record does not preclude a

11   valid tactical reason for not objecting to the closing argument.  (ECF No. 6-1 at 20.)

12   Respondent's example was the possibility that objecting would have brought

13   unnecessary attention to the comments, which would be addressed better in closing.

14   (Id.)  Further, Respondent asserts that the state court reasonably found that Petitioner

15   is unable to show he suffered prejudice from the failure to object because the burning

16   of the car was a collateral issue, and the weight of the evidence supports conviction.

17   (Id. at 20-21.)

18    The Court of Appeals, in the decision here under review, found:

19       Jackett has not shown that there simply could not be a satisfactory
20       reason for defense counsel's failure to object to the prosecutor's argument.
         A prosecutor is given wide latitude to vigorously argue the case and may make
21       remarks based on the evidence and inferences drawn from the record.
22       (People v. Hill (1998) 17 Cal.4th 800, 819.)   Although a defendant may
         "single[] out words and phrases, or at most a few sentences, to demonstrate

23

24

---

25   [9] Petitioner seems to argue as a separate basis for relief that his Due Process rights were violated by
     prosecutorial misconduct.  (See ECF No. 1-2 at 68.)  This claim was not presented to the state courts
26   and is thus unexhausted, barring this court from considering the claim.  See 28 U.S.C. § 2254(b)(1)(A)
     (requiring state prisoners seeking a writ of habeas corpus from a federal court to first exhaust their
27   remedies in state court); Woods v. Sinclair, 764 F.3d 1109, 1129 (9th Cir. 2014) ("A petitioner has
     exhausted his federal claims when he has fully and fairly presented them to the state courts.").

28

misconduct, we must view the statements in the context of the argument as a whole."  (People v. Dennis (1998) 17 Cal.4th 468, 552.)

Defense counsel may have made the reasonable tactical choice not to call attention to the prosecutor's remarks, especially since the jurors had been instructed that they "alone, must judge the credibility or believability of the witnesses."  (People v. Ghent (1987) 43 Cal.3d 739, 773 ["Counsel may well have tactically assumed that an objection or request for admonition would simply draw closer attention to the prosecutor's isolated comments."].)  Defense counsel may have also decided, as a matter of trial tactics, that it would be more effective to counter the prosecutor's argument regarding Margie's credibility during his closing argument, which he did. Defense counsel started his argument by pointing out that Margie was the "key" to the prosecution "get[ting] Mr. Jackett at any cost."  He concluded his argument by arguing "[n]one of what [Margie] said is to be believed."

Moreover, even if defense counsel had objected, we discern no reasonable probability that it would have resulted in an outcome more favorable to Jackett.  (E.g., People v. Maury, supra, 30 Cal.4th at p. 389 ["prejudice must be affirmatively proved; the record must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different' "].)  Margie loved Jackett and did not want to testify against him. Her testimony regarding who burned the Range Rover was a collateral matter with the jury hearing two differing versions from Margie.  With regard to the murder, however, Margie told the police that Jackett admitted to her that he had killed the victim.  While Margie did not repeat that claim during trial, cellular telephone records placed Jackett near the murder scene and revealed that he telephoned Margie from that area almost immediately after the murder.  These records corroborated Margie's testimony that Jackett called her and asked to be picked up from that area.  Although eyewitness accounts differed, five witnesses observed a red– or burgundy–colored Range Rover or SUV at the murder scene.  Three witnesses stated that the gunshots came from the red– or burgundy–colored vehicle.  Finally, Margie told police that after the murder, Jackett took apart a gun and threw the pieces into a marina.  At trial, Margie stated that what she told police about the gun was truthful, except for seeing Jackett taking the gun apart.  Based on this evidence it is unlikely that an objection to the prosecutor's closing argument would have changed the outcome of Jackett's trial. Accordingly, Jackett failed to establish his claim of ineffective assistance of counsel.

21cv1626-L (MSB)

1   (ECF No. 7-30 at 27-29.)

2       Taking into consideration the arguments made by both sides throughout the trial

3   and in closing, Petitioner has not shown that his counsel's failure to object was not a

4   tactical decision.  See Harrington, 562 U.S. at 109 ("[T]here is a 'strong presumption'

5   that counsel's attention to certain issues to the exclusion of others reflects trial tactics

6   rather than 'sheer neglect.'" (quoting Yarborough, 540 U.S. at 8)).  "Although the right

7   to effective assistance of counsel extends to closing arguments, failure to object during

8   a closing summation generally does not constitute deficient performance."  Zapata v.

9   Vasquez, 788 F.3d 1106, 1115 (9th Cir. 2015) (internal citations omitted).  "Because

10  many lawyers refrain from objecting during open and closing argument, absent

11  egregious misstatements, the failure to object during closing argument and opening

12  statement is within the 'wide range' of permissible professional legal conduct."  United

13  States v. Necoecha, 986 F.2d 1273, 1281 (9th Cir.1993).

14      In this case, the prosecutor did not explicitly state that Daniels' testimony

15  exposed her to prosecution for her newly admitted role in burning the Range Rover for

16  insurance money.  Mr. Jordan may have reasonably refrained from objecting to the

17  prosecution's closing argument for reasons recognized by the California Court of Appeal

18  in properly applying a Strickland analysis.  Mr. Jordan may have believed that the

19  prosecutor's statements were not objectionable because of the wide latitude given to

20  prosecutors during arguments, and that objecting would reflect poorly on Petitioner's

21  case.  See United States v. McChristian, 47 F.3d 1499, 1507 (9th Cir.1995) ("[I]n

22  fashioning closing arguments, prosecutors are allowed reasonably wide latitude and are

23  free to argue reasonable inferences from the evidence."); United States v. Molina, 934

24  F.2d 1440, 1448 (9th Cir. 1991) ("From a strategic perspective, . . . many trial lawyers

25  refrain from objecting during closing argument to all but the most egregious

26  misstatements by opposing counsel on the theory that the jury may construe their

27  objections to be a sign of desperation or hyper-technicality.")

28

1   Similarly, Jordan may have feared that an objection would have introduced the

2   immunity in a way that would add credibility to Daniels' trial testimony—because while

3   Daniels' testimony could not be used to prosecute her underlying conduct (arson or

4   insurance fraud, for example), the Court had also admonished Daniels that untrue

5   testimony could be used to prosecute her for perjury.  (ECF No. 7-17 at 147.)  In the end,

6   Jordan may reasonably have suspected that an objection and argument would end with

7   jurors closely analyzing the issue, and ultimately agreeing with the prosecutor that

8   Daniels' desire to point out inconsistencies in her previous testimony that rendered her

9   more culpable, whether those admissions exposed her to criminal liability, still reflected

10  her desire to give truthful testimony.  Further, the comments at-issue were made during

11  the prosecution's initial closing argument and trial counsel may have reasonably

12  concluded that the statements would better be countered during his own closing

13  argument, which he did by stating that Daniels's testimony was "bought and paid for."

14  (ECF No. 7-20 at 115.)

15  Finally, as the California Court of Appeal reasonably noted, Petitioner has not

16  shown a reasonable likelihood that the outcome of his trial would have been different if

17  Jordan had objected.  See Strickland, 466 U.S. at 696 ("[A] court making the prejudice

18  inquiry must ask if the defendant has met the burden of showing that the decision

19  reached would reasonably likely have been different absent the errors.").  As noted

20  previously in this order, Jordan attacked Daniels' credibility in many ways and the Court

21  had noted that the immunity was only demonstrably relevant to Daniels' testimony

22  about the collateral issue of the Range Rover.  Even if an objection had clarified to the

23  jury that Daniels did not face prosecution for her role in the burning of the Range Rover,

24  the jury may nevertheless have found that Daniels' careful correction of certain portions

25  of her statement to the police reflected her desire to give truthful testimony in court.

26  This, combined with additional evidence that implicated Petitioner in the Fox murder,

27  reasonably supported the Court of Appeal's determination that Petitioner has not

28  proven prejudice.  See, e.g., Darden v. Wainwright, 477 U.S. 168, 182 (1986) (citation

1 and internal quotation marks omitted) (finding that the prosecutor's statement during

2 closing argument was not prejudicial because "[t]he weight of the evidence against

3 petitioner was heavy; the overwhelming eyewitnesses and circumstantial evidence to

4 support a finding of guilt on all charges reduced the likelihood that jury's decision was

5 influenced by the argument.").  Five eyewitnesses gave statements regarding a red or

6 burgundy vehicle, often described as an SUV or Range Rover, fleeing the scene.  (See

7 ECF No. 7-15 at 55-79, 79-101, 112-18, 119-31, 139-46, 147-51; ECF No. 7-16 at 52-78.)

8 One of these witnesses saw the black male driver of the burgundy or red SUV, which

9 was possibly a Kia Sportage, with his arm out of the window, firing shots at the victim.

10 (ECF No. 7-15 at 79-90.)  Cellular telephone records indicated that Petitioner called

11 Daniels from the area of the homicide in the minutes that followed, consistent with her

12 testimony.  (ECF No. 7-17 at 33-67).  Thus, the appellate court's determination that the

13 outcome would not likely have been different had trial counsel objected to the

14 prosecutor's comments was not unreasonable.

15      For these reasons, the undersigned finds that the California Court of Appeal did

16 not unreasonably apply Strickland in denying Petitioner's ineffective assistance of

17 counsel claims.

18 ## IV.  CONCLUSION AND RECOMMENDATION

19      For all the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the District

20 Judge issue an Order: (1) approving and adopting this Report and Recommendation, and

21 (2) directing that Judgment be entered **DENYING** the Petition.

22      **IT IS HEREBY ORDERED** that no later than **June 26, 2023**, any party to this action

23 may file written objections with this Court and serve a copy on all parties.  The

24 document should be captioned "Objections to Report and Recommendation."

25 / / /

26 / / /

27 / / /

28 / / /

21cv1626-L (MSB)

1    **IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the

2    Court and served on all parties no later than **July 10, 2023**.  The parties are advised that

3    failure to file objections within the specified time may waive the right to raise those

4    objections on appeal of the Court's order.  See Turner v. Duncan, 158 F.3d 449, 455 (9th

5    Cir. 1998).

6    **IT IS SO ORDERED.**

7    Dated:  June 12, 2023

8    
9    Honorable Michael S. Berg
     United States Magistrate Judge

21cv1626-L (MSB)